IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| STEPHEN GIANNAROS, <br><br> Plaintiff, <br><br> v. <br><br> EPIC SPORTS, INC., <br><br> Defendant. | Civil Action No. <br><br> COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Plaintiff Stephen Giannaros ("Giannaros" or "Plaintiff"), for his Complaint against Epic Sports, Inc. ("Defendant"), by and through his counsel, alleges upon personal knowledge as to himself and upon information and belief as to all other matters, based upon the investigation conducted by and through his counsel, which included, among other things, an investigation of Defendant's digital properties, as follows:

**NATURE AND SUMMARY OF THE ACTION**

1.      This action arises from Defendant's failure to make its online store accessible to blind individuals,[1] which violates the effective communication and equal access requirements of Title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12181-12189. These provisions were enacted "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities"[2] by "assur[ing] equality of opportunity, full participation, independent living, and economic self-sufficiency."[3]

---

[1]      Giannaros uses the word "blind" to describe individuals who, as a result of a visual impairment, have substantially limited eyesight. This includes individuals who have no vision at all, as well as, people who have low vision.

[2]      42 U.S.C. § 12101(b)(1).

[3]      42 U.S.C. § 12101(a)(7).

2.      Although styled as an individual action, the injunctive relief that Giannaros seeks will inure to the benefit of an estimated 2.3 percent of the United States population who report having a visual disability,[4] and to Defendant, who will extend its market reach to this population.[5]

3.      For this significant portion of Americans, accessing websites, mobile applications, and other information via their smartphones has become a necessity, not a convenience. In contrast to the largely stationary internet of the early 2000s, Americans today are increasingly connected to the world of digital information while "on the go" via smartphones.[6]

4.      Indeed, a growing share of Americans now use smartphones as their primary means of online access at home. Today, roughly one-in-five American adults are "smartphone-only" internet users—meaning they own a smartphone, but do not have traditional home broadband service.[7]

5.      The growth of smartphone usage is rivaled only by the myriad ways in which users can harness the capabilities of the internet for the betterment of their lives through education, employment, entertainment, commerce, and countless other pursuits.

---

[4]      Erickson, W., Lee, C., von Schrader, S., Disability Statistics from the American Community Survey (ACS). Ithaca, NY: Cornell University Yang-Tan Institute (YTI), available at www.disabilitystatistics.org (last visited June 2, 2020).

[5]      Sharron Rush, W3C Web Accessibility Initiative, *The Business Case for Digital Accessibility* (Nov. 9, 2018), available at https://www.w3.org/WAI/business-case/ (last visited June 2, 2020) ("The global market of people with disabilities is over 1 billion people with a spending power of more than $6 trillion. Accessibility often improves the online experience for all users.").

[6]      The wide-scale adoption of this technology is staggering. According to Pew Research Center, the vast majority of Americans—96%—now own a cellphone of some kind. And the share of Americans that own smartphones has climbed from just 35% in 2011 to 81% in 2019— amounting to more than 265 million people in the United States. U.S. Census Bureau, U.S and World Population Clock, available at https://www.census.gov/popclock/ (last visited June 2, 2020) (U.S. population on June 12, 2019 was 328.1 million).

[7]      Pew Research Center, *supra* note 6.

6.      The U.S. Chamber of Commerce has documented consumers' increasing reliance

on mobile platforms to shop online:

> The average consumer spends more than $1,700 per year on online shopping, a
> number that's continuing to rise. The convenience, affordability and ability to
> compare prices with ease has led more and more customers to visit e-commerce
> sites before heading to a brick-and-mortar location.[8]

> New research by Leanplum found that 95% of consumers will buy at least half of
> their gifts online. Shoppers, especially millennials and Gen Zers, favor the
> convenience and the great offers and discounts associated more with shopping
> online than visiting a brick-and-mortar location. It's these groups that are driving
> e-commerce retailers to be strategic with their Digital Platform design. The
> Leanplum survey found that 80% of respondents shop on their mobile devices.[9]

7.      But, "[a]s technology continues to evolve at a rapid pace, it is important to consider

factors that can facilitate or impede technology adoption and use by people with disabilities."[10]

8.      This is especially true with respect to accessing the internet by smartphone, where

people with disabilities stand to benefit immensely if online services, like an online store, were

fully and equally accessible to them. The National Federation of the Blind explains:

> In many ways, individuals with disabilities rely on Web content more so than their
> nondisabled peers because of inherent transportation, communication, and other
> barriers. A blind person does not have the same autonomy to drive to a covered
> entity's office as a sighted person. A deaf or hard of hearing person does not have

---

[8]      Emily Heaslip, U.S. Chamber of Commerce, *A Guide to Building an Online Store* (Sept. 20, 2019), available at https://www.uschamber.com/co/start/startup/how-to-build-online-stores (last visited June 2, 2020).

[9]      Emily Heaslip, U.S. Chamber of Commerce, *5 Ways to Optimize Your E-Commerce Site for Mobile Shopping* (Jan. 6, 2020), available at https://www.uschamber.com/co/run/technology/building-mobile-friendly-ecommerce-websites (last visited June 2, 2020); *see also* Emily Heaslip, U.S. Chamber of Commerce, *The Complete Guide to Selling Online* (Jan. 28, 2020), available at https://www.uschamber.com/co/run/technology/small-business-ecommerce-guide (last visited June 2, 2020) ("According to one report, e-commerce is growing 23% each year[.]").

[10]      National Council on Disability, *National Disability Policy: A Progress Report* (Oct. 7, 2016), available at https://ncd.gov/sites/default/files/NCD_ProgressReport_ES_508.pdf (last visited June 2, 2020).

the same opportunity to call a covered entity's office. A person with an intellectual disability does not have the same ability to interact independently with the staff at a covered entity's office. The 24-hour-a-day availability of information and transactions on covered entity websites and mobile apps provides a level of independence and convenience that cannot be replicated through any other means. That is why the number of Americans who rely on the Internet has increased year after year and why entities offer information and transactions through that unique medium.[11]

9.      When digital content is properly formatted, it is universally accessible by smartphones to sighted and blind consumers alike. When it's not, blind individuals are required to expend additional time and effort to overcome obstacles not applicable to sighted consumers, which may require the assistance of third parties or, in some instances, may deny outright access to a company's online service.[12]

10.     Unfortunately, Defendant's digital properties are not properly formatted, and as such, deprive blind of the chance to fully and equally access Defendant's services, which services are otherwise available to nondisabled consumers.

11.     This action seeks to remedy that discrimination and inequality.

---

[11]     Comment from disability rights organizations to DOJ Supplemental Advance Notice of Proposed Rulemaking "Nondiscrimination on the Basis of Disability; Accessibility of Web Information and Services of State and Local Government Entities," C RT Docket No 128, RIN 119-AA65, available at https://www.federalregister.gov/documents/2016/05/09/2016-10464/nondiscrimination-on-the-basis-of-disability-accessibility-of-web-information-and-services-of-state (last visited June 2, 2020), Answer 57 (October 7, 2016) (citations omitted).
[12]     Kasey Wehrum, Inc., *Your Digital Platform is Scaring Customers Away. 5 Easy Ways to Fix It* (Jan. 2014), available at https://www.inc.com/magazine/201312/kasey-wehrum/how-to-get-online-customers-to-complete-purchase.html (last visited June 2, 2020) (documenting the most common causes of shopping cart abandonment, including: "Your Checkout button is hard to find[,]" "Shoppers question the safety of their personal info[,]" and "Getting through the checkout process takes multiple clicks.").

## JURISDICTION AND VENUE

12.     The claims alleged arise under Title III such that this Court's jurisdiction is invoked pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 12188.

13.     Defendant attempts to, and indeed does, participate in the Commonwealth's economic life by offering and providing products and services over the internet to Massachusetts residents, including Giannaros. Unlike, for example, a winery that may not be able sell and ship wine to consumers in certain states, Defendant purposefully avails itself of the benefits and advantages of operating an interactive, online business open 24-hours a day, 7-days a week, 365-days a year to Massachusetts residents.[13]

14.     Giannaros was injured when he attempted to access the Digital Platform from Peabody, Massachusetts, but encountered barriers that denied his full and equal access to Defendant's online goods, content, and services.

15.     "Massachusetts has a strong and historic interest in adjudicating this dispute involving its blind residents. It is the home of the Perkins School for the Blind, which was America's first school for the blind. Helen Keller was taught there."[14]

16.     Venue in this District is proper under 28 U.S.C. § 1391(b)(2) because this is the judicial district in which a substantial part of the acts and omissions giving rise to Giannaros's claims occurred.

---

[13]     *Access Now Inc. v. Otter Products, LLC*, 280 F.Supp.3d 287 (D. Mass. 2017) ("*Otter Products*") (exercising personal jurisdiction over forum plaintiff's Digital Platform accessibility claims against out-of-forum Digital Platform operator); *Access Now, Inc. v. Sportswear, Inc.*, 298 F.Supp.3d 296 (D. Mass. 2018) (same).

[14]     *Otter Products*, 280 F.Supp.3d at 294.

**PARTIES**

17.     Giannaros is a natural person over the age of 18. he resides in and is a citizen of Peabody, Massachusetts, located in Essex County.

18.     He works for the Commonwealth as a Senior Vocational Rehabilitation Counselor, helping other Massachusetts residents with disabilities develop individualized plans for employment, among other things.[15] Giannaros is also a former professional musician.[16]

19.     Giannaros was diagnosed with Cone-rod dystrophy ("CRD") when he was twenty. CRD is a genetic eye disorder which causes vision loss as the light-sensing cells of the retina gradually deteriorate.[17] Today, Giannaros has very little usable sight. As a result, Giannaros is a member of a protected class under the ADA, 42 U.S.C. § 12102(2), and the regulations implementing the ADA set forth at 28 CFR §§ 36.101 *et seq*.

20.     As a result of his visual disability, Giannaros relies on screen reader auxiliary aids, including JAWS from Freedom Scientific and VoiceOver with iOS, to access digital information, like an email, a website, or an app.

21.     Defendant Epic Sports, Inc. is a Nevada corporation with a principal place of business located at 9750 E 53rd St. North, Bel Aire, KS 67226.

22.     Defendant sells sports equipment, apparel, and accessories direct to consumers. Unlike retailers in the past, Defendant does not operate a brick-and-mortar retail storefront that Giannaros can visit in Peabody, Massachusetts, where he lives.

---

[15]     LinkedIn, Steve Giannaros, available at https://www.linkedin.com/in/steve-giannaros-2967853b/ (last visited June 2, 2020).

[16]     SoundCloud, stevegiannaros, available at https://soundcloud.com/sgiannaros (last visited June 2, 2020).

[17]     *Cone-rod dystrophy*, U.S. National Library of Medicine, Genetics Home Reference, available at https://ghr.nlm.nih.gov/condition/cone-rod-dystrophy (last visited June 2, 2020).

23.     In order to access Defendant's products and services, Giannaros must visit Defendant's digital properties at https://www.epicsports.com/ (the "Digital Platform").

24.     Defendant owns, operates, and/or controls its Digital Platform and is responsible for the policies, practices, and procedures concerning the Digital Platform's development and maintenance.[18]

25.     A judgment consistent with the relief sought herein would not unduly burden Defendant; nor would it be commercially unreasonable to order Defendant to make its Digital Platform compliant with the ADA. Defendant sells and ships its products throughout the entire United States, including Massachusetts, and Canada; maintains a robust social media marketing campaign, including into Massachusetts; and has more than 74,000 followers on Facebook, including from Massachusetts.[19]

## STANDING UP FOR TITLE III OF THE ADA

26.     "Congress passed the ADA in 1990 to fix a serious problem—namely, the seclusion of people with disabilities resulting in explicit and implicit discrimination."[20] "It was called the '20th Century Emancipation Proclamation for all persons with disabilities.'"[21] "Title III of the ADA

---

[18]     Epic Sports, Privacy Policy, available at https://www.epicsports.com/privacy.html (last visited June 2, 2020).

[19]     Epic Sports, Facebook, available at https://www.facebook.com/Epic-Sports-162948754939 (last visited June 2, 2020).

[20]     Kelly Johnson, *Testers Standing up for the Title III of the ADA*, 59 Cas. W. Res. L. Rev. 683, 684 (2009), available at http://scholarlycommons.law.case.edu/caselrev/vol59/iss3/6 (last visited June 2, 2020) (*citing* H.R. REP. No. 101-485, pt. 2, at 28-29 (1990)).

[21]     Kelly Johnson *supra* note 17 (*quoting* Russell Hymas & Brett R. Parkinson, Comment, *Architectural Barriers Under the ADA: An Answer to the Judiciary's Struggle with Technical Non-Compliance*, 39 CAL. W. L. REV. 349, 350 (2003), available at https://scholarlycommons.law.cwsl.edu/cgi/viewcontent.cgi?article=1166&context=cwlr (last visited June 2, 2020)); *see also* 136 CONG. REC. 17,369 (1990) (statement of Sen. Tom Harkin) (discussing how facilities have failed to comply with the ADA by not removing barriers that impede access).

contained broad language covering numerous public accommodations; both new construction and existing facilities were required by the statute to remove barriers to access. The disabled population hoped that, as a result of the ADA, their lives would no longer be shaped by limited access and the inability to choose."[22] "However, reality—a lack of compliance with the ADA and severe underenforcement of the statute—soon destroyed this hope."[23]

27.     Thirty years "after the passage of the ADA, numerous facilities are still not compliant leaving the disabled population in a second-class citizenship limbo. Title III of the ADA allows both the U.S. Attorney General[24] and private individuals[25] to sue, but the rate at which [ ] the Attorney General [is] bringing suit seeking compliance is extremely low. The Department of Justice's Disability Section, tasked with ADA enforcement, is understaffed[.]"[26]

28.     Thus, "private suits by necessity represent the main tool for ensuring compliance with Congress' intent in passing the ADA,"[27] most of which "are brought by a small number of private plaintiffs who view themselves as champions of the disabled."[28]

---

[22]     Kelly Johnson *supra* note 17 (*citing* Elizabeth Keadle Markey, Note, *The ADA's Last Stand?: Standing and the Americans with Disabilities Act*, 71 FORDHAM L. REV. 185 (2002), available at https://ir.lawnet.fordham.edu/flr/vol71/iss1/4 (last visited June 2, 2020) (arguing for a more lenient standard for standing under the ADA)).

[23]     Kelly Johnson *supra* note 17 (*citing* Samuel R. Bagenstos, *The Perversity of Limited Civil Rights Remedies: The Case of "Abusive" ADA Litigation*, 54 UCLA L. REV. 1, 3 (2006), available at https://www.uclalawreview.org/the-perversity-of-limited-civil-rights-remedies-the-case-of-abusive-ada-litigation/ (last visited June 2, 2020) (discussing the need for private enforcement in Title III of the ADA and the fact that the limitations courts are placing on ADA plaintiffs are causing abusive litigation)).

[24]     42 U.S.C. § 12188(b).

[25]     42 U.S.C. § 12188(a).

[26]     42 U.S.C. § 12188(a).

[27]     *Betancourt v. Ingram Park Mall*, 735 F. Supp. 2d 587, 596 (W.D. Tex. 2010).

[28]     *Id.* (*quoting Molski v. Evergreen Dynasty Corp.*, 500 F.3d 1047, 1062 (9th Cir. 2007); *D'Lil v. Best Western Encina Lodge & Suite*s, 538 F.3d 1031, 1040 (9th Cir. 2008).

29.     The U.S. Department of Justice ("DOJ") supports this dynamic, recognizing that it "cannot investigate every place of public accommodation" for ADA compliance and that "[p]rivate plaintiffs play an important role in enforcing the ADA[.]"[29]

30.     So has the U.S. District Court for the District of Massachusetts.

[Defendant] also points to the number of cases filed by the same plaintiff in this jurisdiction. Counsel have filed nine cases in this jurisdiction on behalf of [the plaintiff]. I am not impressed by this argument. If the ADA were enforced directly by the government, as are, for example, the fair housing laws, it is likely that government lawyers would have reached out to disabled individuals — "testers" as they are called — to find out which businesses were complying and which were not. [The named plaintiff] has functioned his e as a "tester," which is entirely appropriate.[30]

31.     Consistent with the policies summarized above, Giannaros assumes the role of private attorney general to ensure he and consumers like his may access Defendant's digital services fully and equally.

## SUBSTANTIVE ALLEGATIONS

32.     The internet is a significant source of information, services, and transactions with instant and 24/7 availability and without the need to travel to attain them.

33.     People who are blind access the internet and mobile applications from smartphones and/or personal computers by using keyboard controls and screen access software, which vocalizes information presented visually on a computer screen or displays that information on a user-

---

[29]     Statement of Interest of the United States of America, *ERC v. Abercrombie & Fitch Co.*, Case No. 1:09-cv-03157 (D. Md.), ECF No. 38, at 1 (July 6, 2010); *see also Hensley v. Eckerhart*, 461 U.S. 424, 445 (1983) ("All of these civil rights laws depend heavily upon private enforcement, and fee awards have proved an essential remedy if private citizens are to have a meaningful opportunity to vindicate the important Congressional policies which these laws contain.").

[30]     *Norkunas v. HPT Cambridge, LLC*, 969 F. Supp. 2d 184, 194 (D. Mass. 2013) (Young, J.) (*quoting Iverson v. Braintree Prop. Assocs., L.P.*, No. 04cv12079-NG, 2008 WL 552652, at *3 n.5 (D. Mass. Feb. 26, 2008) (Gertner, J.).

provided refreshable braille display. Such software provides the only method by which blind individuals can independently access the internet and associated computer programs. When websites and mobile applications are not designed to allow for use with screen access software, blind consumers are unable to access the information, products, and services offered through the internet.

34.    Screen access technology has existed for decades[31] and widely-accepted standards exist to guide entities in making their websites and mobile applications accessible to screen access software, including legal standards under Section 508 of the Rehabilitation Act. The U.S. Department of Health & Human Services even maintains Best Practices for Accessible Content to ensure that accessibility is "considered throughout the [website] development process."[32]

### Defendant's Inaccessible Digital Platform

35.    Defendant owns, operates, developed, procured, maintains and/or uses the Digital Platform for the purpose of providing consumers with information, services, and products through computers, smartphones, and other mobile devices.

36.    Defendant is required to ensure that its Digital Platform and electronic communications are accessible to people with disabilities. Despite this obligation, Defendant has denied and continues to deny blind consumers meaningful access to the information, services, products, and other information it offers through the Digital Platform.

37.    Specifically, Giannaros attempted to access Defendant's Digital Platform from Peabody, Massachusetts using the VoiceOver application for iOS (*i.e.* on his iPhone).

---

[31]    Annemarie Cooke, American Foundation for the Blind, *A History of Accessibility at IBM* (Mar. 2004), available at https://www.afb.org/aw/5/2/14760 (last visited June 2, 2020) (Jim Thatcher created the first screen reader at IBM in 1986.)

[32]    U.S. Department of Health & Human Services, usability.gov, Accessibility Basics, available at https://www.usability.gov/what-and-why/accessibility.html (last visited June 2, 2020).

38.     "VoiceOver is a gesture-based screen reader that
lets you enjoy using iPhone even if you don't see the screen. With
VoiceOver enabled, just triple-click the Home button (or the side
button on iPhone X or later) to access it wherever you are in iOS.
Hear a description of everything happening on your screen, from
battery level to who's calling to which app your finger is on. You
can also adjust the speaking rate and pitch to suit you. … You can
control VoiceOver using a simple set of gestures. Touch or drag
your finger around the screen and VoiceOver tells you what's
there. Tap a button to hear a description, then double-tap to select.
Or flick left and right to move from one element to the next. When



you interact with an element, a black rectangle appears around it so sighted users can follow along.
When you prefer privacy, you can activate a screen curtain to turn off the display completely, but
still hear all that VoiceOver has to say. And now with iOS 13, you can choose from a wide range
of gestures and assign those you're most comfortable with to the commands you use most."[33]

39.     Below is an example of another online store's successful use of detailed alternative
text to describe its products to screen reader users.[34] The image on the left illustrates what shoppers
perceive visually. To the right, is an image from the online store with the alternative text
highlighted for that image in green. Although invisible to the eye, screen access software reads
this highlighted text aloud in order to describe the image to shoppers who cannot perceive content
visually. In this example, when shoppers tab to the image file with a screen reader, the online store

---

[33]     Apple, Accessibility, https://www.apple.com/accessibility/iphone/vision/ (last visited June
2, 2020).

[34]     Custom Ink, Homepage, https://www.customink.com/ (last accessed June 2, 2019).

announces, "One burlap and cotton tote bag with a custom printed architectural company logo." Blind shoppers require descriptive alternative text like this to access digital content fully, equally, and independently.



40.    Unlike the example above, Giannaros is unable to understand, and thus is denied the benefit of, much of the Digital Platform's content and services on his smartphone because Defendant has failed to build and maintain its online store in a manner that is compatible with screen access software, including VoiceOver.

41.    As a result of visiting the Digital Platform, and from investigations performed on his behalf, Giannaros found that the Digital Platform denies his full and equal access to the goods and services that Defendant offers. For example:

a.   Defendant prevents screen reader users from accessing some primary content. For example, when consumers visit the Digital Platform from a new IP address, Defendant displays a pop-up window inviting them to "UNLOCK CLOSE-OUT DEALS TODAY" by signing up for its email list. Shoppers who perceive content visually can type their email into the text field that Defendant provides in this pop-up window, then click "CONTINUE" to access the deals. Unfortunately, the Digital Platform does not alert screen readers of this pop-up window. Instead, screen readers remain focused on the content of the



Digital Platform's underlying page, making the pop-up invisible to Giannaros. As a result, it is impossible for Giannaros to perceive this promotion independently, the effect of which would require him to pay more on his order than shoppers who do not use screen reader technology to shop online.

b.   Consumers will discover an option in the Digital Platform's navigation menu to contact Defendant's customer service. After consumers click the "CHAT ONLINE" button, Defendant displays a pop-up window on the screen prompting consumers to




provide their name and email address. Consumers who perceive content visually may provide this information in the appropriate text fields to contact Defendant's customer service. Unfortunately, Defendant does not alert screen readers to this pop-up window. Instead, screen readers remain stuck on the unrelated elements in the Digital Platform's underlying page. As a result, Giannaros is unlikely (or unable) to access this important help tool independently.

c.      Defendant does not provide a text equivalent for non-text elements. Providing text alternatives allows the information to be rendered in a variety of ways by a variety of users. A person who cannot see a picture, logo, or icon can have a text alternative read aloud using synthesized speech. For example, the Digital Platform provides a five-star rating for many products that Defendant sells. Shoppers who perceive content visually can see whether a particular product has one, two, three, four, or five stars, and base their purchasing decisions on this information. Unfortunately, Defendant's accessibility policies  fail to provide sufficiently descriptive alternative text for this important rating information. To this end, Giannaros's screen reader does not provide any audio information when it hovers over the stars on the Digital Platform. As a result, Giannaros must make his purchasing decisions without the benefit of knowing whether the products he's researching are well received by other shoppers.

d.    Defendant does not provide a sufficient text equivalent for many important non-text elements. Providing text alternatives allows information to be rendered in a variety of ways by a variety of users. A person who cannot see a picture, logo, or icon can have a text alternative read aloud using synthesized speech. For example, shoppers who perceive content visually will see an image on the Digital Platform with text that provides: "EASTON UP TO 30% OFF Some exclusions apply Use coupon code EASTON." Shoppers who perceive this content visually can perceive the coupon code, "EASTON," and use it at checkout.



Unfortunately, the alternative text associated with this image provides: "Easton save up to 30 percent link image main landmark." This alternative text frustrates Giannaros's shopping experience because it does not include the coupon code he requires to access the discounted prices at checkout. As a result, he will have no choice but to pay more for Easton products than will shoppers who do not use screen reader auxiliary aids to shop online.

15

e.      Defendant prevents screen reader users who navigate sequentially through content from accessing primary content directly. For example, upon visiting the Digital Platform, shoppers who perceive content visually will see a floating bubble with text that reads, "CLOSE-OUT DEALS," and understand that by clicking it, Defendant will present them with additional information regarding these deals. Unfortunately, because Defendant's accessibility policies fail to ensure the Digital Platform is compatible with screen reader auxiliary aids, Giannaros cannot activate this feature with his screen reader. Once again, the barriers on the Digital Platform will force Giannaros to pay more for his purchases than will shoppers who do not have a visual impairment.



f.      Defendant does not provide a text equivalent for non-text elements. Providing text alternatives allows the information to be rendered in a variety of ways by a variety of consumers. A person who cannot see a picture, logo, or icon can have a text alternative read aloud using synthesized speech. For example, consumers who perceive content visually will notice various logos on the Digital Platform's checkout platform identifying the payment methods that Defendant accepts, including Visa, Mastercard, American Express, and Discover. Unfortunately, Defendant's accessibility policies fail to ensure all of these logos include sufficiently descriptive alternative text. When screen readers hover over the



image, Defendant announces "supported credit cards," only. Because this alternative text does not provide sufficient detail, Giannaros is unable to determine whether the Digital Platform accepts his preferred method of payment.

### Plaintiff's Injury

42.     The access barriers described above, and others, deny Giannaros full and equal access to the services Defendant offers on its Digital Platform, and now deter Giannaros from attempting to use the Digital Platform.[35]

43.     Still, Giannaros intends to attempt to access the Digital Platform within the next six months to research the goods and services Defendant offers or to test the Digital Platform for compliance with the ADA.[36]

44.     If the Digital Platform were accessible (*i.e.* if Defendant removed the access barriers and implemented the practices described herein), Giannaros could independently access Defendant's online services.

### Defendant's Digital Platform Must Comply with the ADA

45.     The ADA "as a whole is intended 'to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities.'"[37]

46.     Title III advances that goal by providing that "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation."[38]

---

[35]     *Your Digital Platform is Scaring Customers Away. 5 Easy Ways to Fix It*, *supra* note 12.
[36]     *Norkunas* and *Iverson supra* note 27.
[37]     *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 589 (1999) (*quoting* 42 U.S.C. § 12101(b)(1)).
[38]     42 U.S.C. § 12182(a).

47.     DOJ regulations require that a public accommodation "furnish appropriate auxiliary aids and services where necessary to ensure effective communication with individuals with disabilities."[39]

48.     DOJ defines "auxiliary aids and services" to include "accessible electronic and information technology" or "other effective methods of making visually delivered materials available to individuals who are blind or have low vision."[40]

49.     Therefore, the ADA mandates that places of public accommodation provide auxiliary aids and services to make visual materials available to individuals who are blind.[41]

50.     Defendant is a place of public accommodation under the ADA because it is a "sales or rental establishment" and/or "other service establishment."[42]

51.     The Digital Platform is a service, facility, advantage, or accommodation of Defendant.

52.     As a service, facility, advantage, or accommodation of Defendant, Defendant must ensure blind patrons have full and equal access to the Digital Platform's services.

53.     Indeed, the ADA expressly provides that a place of public accommodation engages in unlawful discrimination if it fails to "take such steps as may be necessary to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services."[43]

---

[39]     28 C.F.R. § 36.303(c)(1); *see Bragdon v. Abbott*, 524 U.S. 624, 646 (1998) (holding that DOJ's administrative guidance on ADA compliance is entitled to deference).
[40]     28 C.F.R. § 36.303(b)(2).
[41]     28 C.F.R. § 36.303.
[42]     42 U.S.C. § 12181(7)(E), (F).
[43]     42 U.S.C. § 12182(b)(2)(A)(iii).

**Defendant Received Fair Notice of its ADA Obligations**

54.     Defendant, and other covered entities, have had more than adequate notice of their obligation to offer individuals with disabilities an equal opportunity to access and enjoy their online services and communications.

55.     Since its enactment in 1990, the ADA has clearly stated that covered entities must provide "full and equal enjoyment of the[ir] goods, services, facilities, privileges, advantages, or accommodations" to people with disabilities,[44] and must "ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services."[45]

56.     DOJ first announced its position that Title III applies to websites of public accommodations in a 1996 letter from Assistant Attorney General Deval Patrick responding to an inquiry by Senator Tom Harkin regarding the accessibility of websites to blind individuals.[46]

57.     Since then, DOJ has "repeatedly affirmed the application of [T]itle III to Web sites of public accommodations."[47]

58.     In 2000, DOJ argued to the U.S. Court of Appeals for the Fifth Circuit that a business providing services solely over the internet is subject to the ADA's prohibitions on discrimination on the basis of disability.[48]

---

[44]     42 U.S.C. § 12182(a).
[45]     42 U.S.C. § 12182(b)(2)(A)(iii).
[46]     Letter from Deval L. Patrick, Assistant Attorney General, Civil Rights Division, Department of Justice, to Tom Harkin, U.S. Senator (Sept. 9, 1996), available at w https://www.justice.gov/crt/foia/file/666366/download (last visited June 2, 2020)
[47]     75 Fed. Reg. 43460-01, 43464 (July 26, 2010).
[48]     Brief of the United States as Amicus Curiae in Support of Appellant, *Hooks v. Okbridge, Inc.*, Case No. 99-50891 (5th Cir. June 30, 2000), https://www.justice.gov/sites/default/files/crt/legacy/2010/12/14/hooks.pdf (last visited June 2, 2020) ("A COMMERCIAL BUSINESS PROVIDING SERVICES SOLELY OVER THE

59.     In 2002, DOJ argued to the U.S. Court of Appeals for the Eleventh Circuit that there is no need for a nexus between a challenged activity and a private entity´s "brick-and-mortar" facility to obtain coverage under Title III. DOJ argued that Title III applies to any activity or service offered by a public accommodation, on or off its premises.[49]

60.     In 2014, DOJ entered into a settlement agreement with America's then-leading internet grocer to remedy allegations that its website, www.peapod.com, was inaccessible to some individuals with disabilities, in violation of the ADA. DOJ's enforcement action against this online-only business affirms the ADA covers public accommodations that do not operate brick-and-mortar facilities open to the public.[50]

61.     In a September 25, 2018 letter to U.S. House of Representative Ted Budd, U.S. Department of Justice Assistant Attorney General Stephen E. Boyd confirmed that public accommodations must make the websites they own, operate, or control equally accessible to individuals with disabilities. Assistant Attorney General Boyd's letter provides:

> The Department [of Justice] first articulated its interpretation that the ADA applies to public accommodations' websites over 20 years ago. This interpretation is consistent with the ADA's title III requirement that the goods, services, privileges, or activities provided by places of public accommodation be equally accessible to people with disabilities.[51]

---

INTERNET IS SUBJECT TO THE ADA'S PROHIBITION AGAINST DISCRIMINATION ON THE BASIS OF DISABILITY.") (emphasis in original).

[49]     Brief for the United States as Amicus Curiae in Support of Appellant, *Rendon v. Valleycrest Productions, Inc.*, Case No. 01-11197, 294 F.3d 1279 (11th Cir. 2002), available at https://www.justice.gov/sites/default/files/crt/legacy/2010/12/14/rendon.pdf (last visited June 2, 2020).

[50]     Settlement Agreement Between the United States of America and Ahold U.S.A., Inc. and Peapod, LLC, DJ 202-63-169 (Nov. 17, 2014), available at https://www.justice.gov/file/163956/download (last visited June 2, 2020).

[51]     Letter from Assistant Attorney General Stephen E. Boyd, U.S. Department of Justice, to Congressman Ted Budd, U.S. House of Representatives (Sept. 25, 2018), https://www.adatitleiii.com/wp-content/uploads/sites/121/2018/10/DOJ-letter-to-congress.pdf (last visited June 2, 2020).

62.     In 2019, the United States Supreme Court declined to review a Ninth Circuit decision holding that (1) Title III of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("Title III") covers websites and mobile applications and (2) the imposition of liability on businesses for not having an accessible Digital Platform and mobile application does not violate the due process rights of public accommodations.[52]

63.     Thus, since at least since 1996, Defendant has been on notice that its online offerings must effectively communicate with disabled consumers and facilitate "full and equal enjoyment" of the goods and services it offers.[53]

### SUBSTANTIVE VIOLATION

### Title III of the ADA, 42 U.S.C. § 12181 *et seq.*

64.     The assertions contained in the previous paragraphs are incorporated by reference.

65.     Title III of the ADA guarantees that individuals with disabilities shall have full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation.[54]

66.     Defendant is bound by the regulations implementing Title III of the ADA, which require that places of public accommodation ensure effective communication to individuals with disabilities.[55]

67.     Giannaros is limited in the life activity of seeing and therefore an individual with a disability under the ADA.

---

[52]    *Robles v. Domino's Pizza, LLC*, 913 F.3d 898 (9th Cir. 2019) cert. denied 589 U.S. ___ (U.S. Oct. 7, 2019) (No. 18-1539).
[53]    42 U.S.C. § 12182(a).
[54]    42 U.S.C. § 12182; 28 C.F.R. § 36.201.
[55]    28 C.F.R.§ 36.303(c).

68.     Defendant is a place of public accommodation under the ADA because it is a "sales or rental establishment" and/or "other service establishment."[56]

69.     Defendant owns, operates, or maintains the Digital Platform.

70.     The Digital Platform is a service, facility, privilege, advantage, or accommodation of Defendant.

71.     The Digital Platform contains barriers that prevent full and equal use by blind consumers, including Giannaros, using screen access software.

72.     Because of these barriers, Defendant denies Giannaros full and equal enjoyment of the information, goods, services, facilities, privileges, advantages, or accommodations that it makes available to the sighted public through the Digital Platform.

73.     Although he intends to return to the Digital Platform in the future, these access barriers now deter Giannaros from attempting to use the Digital Platform.

74.     Defendant's discrimination is ongoing.

## PRAYER FOR RELIEF

WHEREFORE, Giannaros requests judgment as follows:

(A)     A Declaratory Judgment that at the commencement of this action Defendant was in violation of the specific requirements of Title III of the ADA described above, and the relevant implementing regulations of the ADA, in that Defendant took no action that was reasonably calculated to ensure the Digital Platform is fully accessible to, and independently usable by, individuals with visual disabilities;

(B)     A permanent injunction pursuant to 42 U.S.C. § 12188(a)(2) and 28 CFR § 36.504(a) which directs Defendant to take all steps necessary to bring the Digital Platform into full

---

[56]     42 U.S.C. § 12181(7)(E), (F).

compliance with the requirements set forth in the ADA, and its implementing regulations, so that the Digital Platform is fully accessible to, and independently usable by, blind individuals, and which further directs that the Court shall retain jurisdiction for a period to be determined to ensure that Defendant has adopted and is following an institutional policy that will in fact cause it to remain fully in compliance with the law—the specific injunctive relief requested by Plaintiff is described more fully below:[57]

(1)    Within 90-days of the Court's Order, Defendant shall complete an accessibility audit of its Digital Platform that will examine the accessibility and usability of the Digital Platform by consumers who are blind.

(2)    Within 180-days of the Court's Order, Defendant shall develop a corrective action strategy ("Strategy") based on the audit findings. In addition to the deadlines outlined below, the Strategy shall include dates by which corrective action shall be completed.

(3)    Within 210-days of the Court's Order, Defendant shall disseminate the Strategy among its executive-level managers, employees, and contractors, if any, involved in digital development and post it on the Digital Platform.

(4)    Within 90-days of the Court's Order, Defendant shall develop a Digital Accessibility Policy Statement that demonstrates its commitment to digital accessibility to blind and other print disabled consumers, as required by the Americans with Disabilities Act. This Policy Statement shall be posted on the Digital Platform within 120-days of the Court's Order, and shall

---

[57]    The injunctive relief requested is consistent with a 2011 settlement agreement entered into between National Federation of the Blind and The Pennsylvania State University, available at https://accessibility.psu.edu/nfbpsusettlement/ (last visited June 2, 2020); a 2014 settlement agreement between the U.S. Department of Justice and Ahold U.S.A., Inc. and Peapod, LLC, *supra* note 47; and a 2014 Resolution Agreement between the U.S. Department of Education and Youngstown State University, available at https://www2.ed.gov/documents/press-releases/youngstown-state-university-agreement.pdf (last visited June 2, 2020).

disclose that an audit is taking or has taken place and that a Strategy will be disseminated and posted on the Digital Platform within 180-days of the Court's Order.

(5)     Within 240-days of the Court's Order, Defendant shall develop procedures to implement its Digital Accessibility Policy across the entire Digital Platform. Defendant shall disseminate its Policy and procedures to its executive-level managers, employees, and contractors, if any, involved in digital development.

(6)     Within 12-months of the Court's Order, Defendant shall conduct training, instruction and support to ensure that all executive-level managers and employees involved in digital development are aware of and understand the Digital Accessibility Policy, including proper procedures, tools, and techniques to implement the Digital Accessibility Policy effectively and consistently.

(7)     Within 12-months of the Court's Order, Defendant shall hire or designate a staff person with responsibility and commensurate authority, to monitor the Digital Accessibility Policy and procedures.

(8)     Within 12-months of the Court's Order, Defendant shall develop and institute procedures that require third-party content and plug-ins built into the Digital Platform to provide blind consumers the same programs, benefits and services that they do to individuals without disabilities, except that when it is technically unfeasible to do so. Defendant shall effectuate these obligations by, among other things, implementing as part of its Request for Proposal process language that bidders meet the accessibility standards set forth in WCAG 2.0 Level AA for web-based technology and the Americans with Disabilities Act; requiring or encouraging, at Defendant's discretion, as part of any contract with its vendors, provisions in

which the vendor warrants that any technology provided complies with these standards and any applicable current federal disability law.

(9)     Within 18-months, all pages hosted on the Digital Platform that have been published shall be Accessible to blind users. "Accessible" means fully and equally accessible to and independently usable by blind individuals so that blind consumers are able to acquire the same information, engage in the same interactions, and enjoy the same services as sighted consumers, with substantially equivalent ease of use.

(10)    Defendant shall not release for public viewing or use a substantial addition, update, or change to the Digital Platform until it has determined through automated and user testing that those proposed additions, updates, or changes are Accessible.

(11)    Defendant shall conduct (a) an automated scan monthly and (b) end-ser testing quarterly thereafter to ascertain whether any new posted content is accessible. Defendant shall notify all employees and contractors, if any, involved in digital development if corrections to Digital Platform are needed and of reasonable timelines for corrections to be made. Defendant shall note if corrective action has been taken during the next monthly scan and quarterly end-user test.

(12)    Following the date of the Court's Order, for each new, renewed, or renegotiated contract with a vendor of Third-Party Content, Defendant shall seek a commitment from the vendor to provide content in a format that is Accessible.

(13)    Defendant shall provide Plaintiff, through his counsel, with a report on the first and second anniversaries of the Court's Order which summarize the progress Defendant is making to meet its obligations. Additional communication will occur before and after each

anniversary to address any possible delays or other obstacles encountered with the implementation of the Digital Accessibility Policy.

(C)     Payment of actual, statutory, nominal, and other damages, as the Court deems proper;

(D)     Payment of costs of suit;

(E)     Payment of reasonable attorneys' fees, pursuant to 42 U.S.C. § 12205 and 28 CFR § 36.505, including costs of monitoring Defendant's compliance with the judgment;[58]

(F)     Whatever other relief the Court deems just, equitable and appropriate; and

An Order retaining jurisdiction over this case until Defendant has complied with the Court's Orders.

Dated: June 2, 2020                         Respectfully Submitted,

                                            /s/ Jason M. Leviton
                                            Jason M. Leviton (BBO# 678331)
                                            **BLOCK & LEVITON LLP**
                                            155 Federal Street, Suite 400
                                            Boston, MA 02110
                                            Phone: (617) 398-5600
                                            jason@blockesq.com

                                            Kevin W. Tucker (He/Him/His)
                                            Pa. No. 312144
                                            Kevin J. Abramowicz

---

[58]     S*ee Access Now, Inc. v. Lax World, LLC*, No. 1:17-cv-10976-DJC (D. Mass. Apr. 17, 2018) (ECF 11) ("[Plaintiff], as the prevailing party, may file a fee petition before the Court surrenders jurisdiction. Pursuant to *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S. 546, 559 (1986), *supplemented*, 483 U.S. 711 (1987), and *Garrity v. Sununu*, 752 F.2d 727, 738-39 (1st Cir. 1984), the fee petition may include costs to monitor [Defendant's] compliance with the permanent injunction."); *see also* Amended Order Granting In Part Plaintiffs' Motion For Attorneys' Fees And Costs; Denying Administrative Motion To Seal, *National Federation of the Blind of California v. Uber Technologies, Inc.*, Case No 14-cv-04086-NC (N.D. Cal. Nov. 8, 2019), https://rbgg.com/wp-content/uploads/NFB-v-Uber-Amended-Order-Granting-In-Part-Pltfs-Motion-for-Attys-Fees-and-Costs-11-08-19.pdf (last accessed June 2, 2020) (finding plaintiffs "are entitled to reasonable attorneys' fees incurred in connection with monitoring [defendant's] compliance with the Settlement" of a Title III ADA case).

Pa. No. 320659
**EAST END TRIAL GROUP LLC**
186 42nd St., P.O. Box 40127
Pittsburgh, PA 15201
Tel. (412) 877-5220
ktucker@eastendtrialgroup.com
kabramowicz@eastendtrialgroup.com

*Counsel for Plaintiff*